NIES, Circuit Judge.
UMC Electronics Company brought this action, pursuant to 28 U.S.C. § 1498(a), to recover compensation for use of its patented invention by the United States. UMC is the owner of Patent No. 3,643,513, issued February 22, 1972, by assignment from the inventor Preston Weaver. The United States Claims Court, 8 Cl.Ct. 604, 228 USPQ 396 (1985), upheld the validity of all claims (1-4) but dismissed the complaint on the ground of no infringement or, more accurately, no use of the patented invention by the United States. Both parties appeal. *649 We reverse the Claims Court’s holding that the patented invention was not on sale within the meaning of 35 U.S.C. § 102(b).[1] Accordingly, we affirm the judgment in favor of the government, but on different grounds.
I
Background
The claimed invention is an aviation counting accelerometer (ACA), a device for sensing and for recording the number of times an aircraft has been subjected to predetermined levels of acceleration.[2] The sensor component is mounted on the aircraft in a direction to measure acceleration loading and is connected electrically to the recorder component. Records produced by an ACA can indicate an aircraft’s remaining useful life and show the need for structural inspection, overhaul, or rotation to less demanding service.
The patent application which became the patent in this suit (’513) was filed on August 1, 1968. Under 35 U.S.C. § 102(b) the commercial exploitation and the state of development of the invention one year before the filing of the application for the subject invention are critical to resolution of the on-sale issue.
Prior to the late 1960’s when UMC first entered this field, the U.S. Navy had procured ACA’s from Maxson Electronics Company and from Giannini Controls Corporation. The Navy was dissatisfied with these ACA’s because they sometimes recorded data that defied common sense, failed to count accelerations, or counted accelerations that never occurred. In 1966 the Navy contacted Preston Weaver, an employee of UMC, told him of the problems with existing ACA’s and informed him of the Navy’s interest in buying improved devices. Weaver designed an accelerometer, model UMC-A, and in late 1966, UMC was awarded a contract to supply the Navy with approximately 1600 units.
In early 1967, UMC concluded that its model UMC-A would not meet the Navy’s performance specification required by its contract. Like the Maxson and Giannini ACA’s, the UMC-A accelerometer utilized, as part of its sensor, an electromechanical transducer to mechanically generate signals that indicate levels of acceleration.[3] Like the Maxson and Giannini devices, the *650 UMC-A device sometimes counted and sometimes did not count the same acceleration load. The problem lay in the inherent frequency of the mass-spring system in the transducer. The devices could not distinguish between acceleration due to inflight maneuvers, which determines actual stress, and acceleration from other sources, e.g., windgusts or weapons release.
To prevent UMC from losing the ACA contract, Weaver began work to improve the sensor portion of an ACA and conceived his invention which uses an analog transducer in the sensor. An analog transducer electrically generates a varying signal (in contrast to the mechanically produced signal of prior devices) which can be filtered electronically to selectively remove the effects of superimposed vibrations. The Claims Court found that in April-May of 1967 Weaver built and tested an engineering prototype of his ACA containing a commercial analog transducer, a filter, a timing circuit and a voltage sensor that measured one load level. UMC sought to modify the existing contract for ACA’s to substitute an analog transducer for the electro-mechanical transducer specified in the contract, but was unsuccessful in negotiating a modification.
In late May, 1967, the Navy issued new specifications and in July, 1967, requested proposals from contractors to deliver ACA’s built to the new specification (Mil-A-22145B). Technically, the request for proposals called separately for a certain number of sensor components of an ACA system and a certain number of recorders, the two units being compatible in combination. UMC responded to the request on July 27, 1967, the final date for making a proposal, with an offer to supply $1,668,743 worth of its improved ACA (hereinafter model UMC-B). UMC represented as part of its proposal that the sensor portion “has been constructed and tested in conjunction with voltage sensing and time controlled circuitry.” In response to a Navy inquiry, on August 2, 1967, after the critical date, UMC submitted a technical proposal which described the model UMC-B in detail and included test results and schematic drawings. On August 9, 1967, UMC gave a demonstration of its device to the Navy at the UMC facility.
In early 1968 the Navy canceled the request to which the above submission of UMC was directed, and in July 1968, it issued another. The latter request eventually led to a contract with Systron-Don-ner Corporation, which company has been providing the Navy with ACA’s utilizing analog transducers since 1970.
In June, 1980, UMC filed the instant action against the United States seeking compensation (after attempting for a number of years to obtain compensation directly from the Navy) by reason of the Navy’s alleged use of its invention in the Systron-Donner ACA’s. The Claims Court upheld the validity of the patent claims, which were challenged by the government on a number of grounds, but found that the Systron-Donner ACA’s did not fall within the scope of the claims. Both parties appeal: UMC asking for reversal of the Claims Court’s finding of no infringement; the government seeking to have the claims in suit held invalid. Since we conclude that the Claims Court erred as a matter of law in holding that the claims of the ’513 patent were not invalid under section 102(b), we need discuss only that issue in detail.
II

The Claims Court Decision

The Claims Court analyzed the on-sale bar under the following three-part test set out in In re Corcoran, 640 F.2d 1331, 1333-34, 208 USPQ 867, 870 (CCPA 1981), taken from Timely Prods. Corp. v. Arron, 523 F.2d 288, 302, 187 USPQ 257, 267-68 (2d Cir.1975)[4]:
*651 (1) The complete invention claimed must have been embodied in or obvious in view of the thing offered for sale____ Complete readability of the claim on the thing offered is not required because whatever is published (or on sale) more than one year prior to the filing of a patent application becomes part of the prior art over which the claim must be patentable____
(2) The invention must have been tested sufficiently to verify that it is operable and commercially marketable. This is simply another way of expressing the principle that an invention cannot be offered for sale until it is completed, which requires not merely its conception but its reduction to practice____
(3) Finally, the sale must be primarily for profit rather than for experimental purposes____ [Citations omitted.]
Proceeding through the Timely Products requirements in reverse order, the Claims Court first noted that UMC had admitted that its offer to the Navy was for profit, not for experimentation. The court then found that the invention of the ’513 patent had been reduced to practice before the critical date by Weaver’s tests of the engineering prototype of the ACA in April-May, 1967, because Weaver admitted that as a result of those tests he was satisfied that his invention would serve its intended purpose. 8 Cl.Ct. at 620, 228 USPQ at 403-04. However, the court found the first requirement that the complete invention must be embodied in the thing offered for sale was not met because the engineering prototype did not include all elements of the claims. The court found that the evidence established that the inventor had not built a physical embodiment of the invention including all limitations of the claims before the critical date.
The court then construed the decision of this court in Barmag Barmer Maschinen-fabrik AG v. Murata Mach., Ltd., 731 F.2d 831, 221 USPQ 561 (Fed.Cir.1984). It interpreted Barmag as making an exception to the physical embodiment requirement where “commercial benefits outside the allowed time have been great.” Because UMC “never produced its ACA,” the court found it “reaped no commercial benefits.” Based on those findings, the court held that the invention of the ’513 patent was not on sale within the meaning of section 102(b).
The court also held that the invention would not have been obvious from the prototype, which the court considered to be the thing offered for sale. 8 Cl.Ct. at 620, 228 USPQ at 404. This was error in the court’s analysis, the Prototype not being the thing offered for sale. The subject matter of the offer for sale is admittedly the claimed invention.
The government maintains that, properly interpreted, all three Timely Products requirements had been met, namely, (1) there was an offer to sell model UMC-B accelerometers which embodied the invention of the claims, (2) the invention had been reduced to practice, and (3) the offer to sell was for profit, not experimentation. Thus, per the government, the Claims Court erred as a matter of law in not holding the claims barred under section 102(b). UMC counters that because the inventor never built a physical embodiment containing all elements of the claims, the Claims Court erred in finding a reduction to practice of the invention, but that the court’s error was cancelled out by its separate requirement for a physical embodiment.
Ill
As an initial matter, UMC is correct in pointing out the inconsistency between the Claims Court’s conclusion that the claimed invention was “reduced to practice” before the critical date and its separate finding that no physical embodiment of the invention existed at that time. It is not sufficient for a reduction to practice that Weaver built and tested only a part of *652 the later-claimed model UMC-B accelerometer. Under our precedent there cannot be a reduction to practice of the invention here without a physical embodiment which includes all limitations of the claim. See, e.g., Correge v. Murphy, 705 F.2d 1326, 1329, 217 USPQ 753, 755 (Fed.Cir.1983); 1 C. Rivise & A. Caesar, Interference Law and Practice § 137 (1940) and cases cited therein. Because the court found and the parties do not dispute that there was no physical embodiment containing all limitations of the claimed invention before the critical date, we conclude that the Claims Court erred in holding that there had been a reduction to practice.
The clarification of that issue, however, does not resolve the precise dispute here. Per the government, UMC’s substantial attempted commercial exploitation of the claimed invention contravenes the policies of the on-sale bar despite the absence of a complete embodiment and, thus, raises an on-sale bar under section 102(b). For this proposition the government relies on the decision of this court in Barmag. On the other hand, UMC maintains that, as a matter of law, there is no on-sale bar unless the claimed invention had been reduced to practice before the critical date, and urges that we here reject the contrary suggestion in Barmag. Thus, we address first the issue whether reduction to practice of the claimed invention before the critical date is required to invoke the on-sale bar, and conclude, for reasons that follow, that reduction to practice is not always a requirement of the on-sale bar.[5] This leads to the issue whether there is an on-sale bar in this case. On the undisputed facts, we hold that the invention of the '513 patent was on sale within the meaning of section 102(b).
IV
Whether a reduction to practice is a requirement of the on-sale bar of 35 U.S.C. § 102(b) requires a review of our precedent.[6] However, the issue has been directly addressed by this court or its predecessors in only two cases, Barmag and General Electric Co. v. United States, 654 F.2d 55, 60-61, 211 USPQ 867, 872-73 (Ct.Cl.1981) (en banc), although the issue has surfaced in others. In General Electric Co. v. United States, 654 F.2d at 61-64, 211 USPQ at 873-75, the Court of Claims, one of this court’s predecessors, analyzed an on-sale bar issue by focusing on the policies underlying the bar to determine whether application of the bar would further those policies. Those policies were stated to be:
First, there is a policy against removing inventions from the public which the public has justifiably come to believe are freely available to all as a consequence of prolonged sales activity. Next, there is a policy favoring prompt and widespread disclosure of new inventions to the public. The inventor is forced to file promptly or risk possible forfeiture of his invention [patent] rights due to prior sales. A third policy is to prevent the inventor from commercially exploiting the exclusivity of his invention substantially beyond the statutorily authorized 17-year period. The on-sale bar forces the inventor to choose between seeking patent protection promptly following sales activity or taking his chances with his competitors without the benefit of patent protection. The fourth and final identifiable policy is to give the inventor a reasonable amount of time following sales activity (set by statute as 1 year) to determine whether a patent is a worthwhile investment. This benefits the public because it tends to minimize the filing of inventions [sic] of only marginal public interest.
*653 654 F.2d at 61, 211 USPQ at 873 (citations omitted). On the facts of that case, the court held that the policies were violated and that there was a reduction to practice before the critical date. 654 F.2d at 62, 211 USPQ at 874. The latter holding obviated the need to agree or disagree with a detailed analysis of the trial judge,-who had concluded that reduction to practice was not “indispensable in every case.”[7]
In Barmag, the court went out of its way to reserve the question whether a physical embodiment should be a requirement of the on-sale bar in all cases. 731 F.2d at 836-37, 221 USPQ at 565. Without a physical embodiment, as stated above, there can be no reduction to practice.
Contrary to the Claims Court’s interpretation, Barmag did not suggest that an embodiment might not be required only in instances where there had been actual sales of goods. An offer to sell a later-claimed invention may be sufficient to invoke the bar whether the offer is accepted or rejected. King Instrument Corp. v. Otari Corp., 767 F.2d 853, 860, 226 USPQ 402, 406 (Fed.Cir.1985), cert. denied, — U.S. -, 106 S.Ct. 1197, 89 L.Ed.2d 312 (1986); In re Caveney, 761 F.2d 671, 675, 226 USPQ 1, 3 (Fed.Cir.1985); Barmag, 731 F.2d at 836-37, 221 USPQ at 565; D.L. Auld Co. v. Chroma Graphics Corp., 714 F.2d 1144, 1147, 219 USPQ 13, 18 (Fed.Cir.), cert. denied, 825 U.S. 474, 106 S.Ct. 83, 88 L.Ed.2d 68 (1985); General Electric, 654 F.2d at 60, 211 USPQ at 872; In re Theis, 610 F.2d 786 at 791, 204 USPQ at 192; Gould, Inc. v. United States, 579 F.2d 571, 583-84, 198 USPQ 156, 167 (Ct.Cl.1978).
In Western Marine Elecs., Inc. v. Furuno Elec. Co., 764 F.2d 840, 844, 226 USPQ 334, 337 (Fed.Cir.1985), the argument was made that the patented invention, a gravity stabilized sonar device used on fishing boats, had not been reduced to practice and, thus, had not been on sale before the critical date. Because the device had not been mounted on a boat, it was argued, the device had not been sufficiently tested and, thus, had not been reduced to practice. In holding the invention to be on sale, the court did not directly answer that issue, stating that the “totality of the circumstances” determined whether the device was on sale. It reiterated:
Rigid standards are especially unsuited to the on sale provision where the policies underlying the bar, in effect, define it. See TP Laboratories, Inc. v. Professional Positioners, Inc., 724 F.2d 965, 973, 220 USPQ 577, 583 (Fed.Cir.1984) [cert. denied, 469 U.S. 826,105 S.Ct. 108, 83 L.Ed.2d 51 (1985)] (public use).
As a result, this court has been careful to avoid erecting rigid standards for section 102(b).... While approving of the Timely Products criticism of the “on hand” doctrine because the doctrine often produces results contrary to the basic policies underlying the on sale bar, this court [in Barmag ] nevertheless declined to adopt the Timely Products test for all cases.
Accord J.A. LaPorte Inc. v. Norfolk Dredging Co., 787 F.2d 1577, 1580 n. 4, 229 USPQ 435, 437 n. 4 - (Fed.Cir.1986), cert. denied, — U.S. -, 107 S.Ct. 274, 93 L.Ed.2d 250 (1986); King Instrument, 767 F.2d 853, 226 USPQ 402; In re Caveney, 761 F.2d 671, 226 USPQ 1.
*654 In a number of decisions the factual findings leading to the conclusion that there was no on-sale bar appear to be based on the assumption that reduction to practice is required, even though “reduction to practice” is not mentioned in the decision. In a footnote in In re Dybel, 524 F.2d 1393, 187 USPQ 593 (CCPA 1975), that court stated, “Moreover, ‘the invention’ was not in existence before it was actually installed on the Ford press since the claims required the press and electronic circuit as well as the transducer.” 524 F.2d at 1401 n. 8, 187 USPQ at 598 n. 8 (citation omitted).
In Shatterproof Glass Corp. v. Libbey-Owens Ford Co., 758 F.2d 613, 622-23, 225 USPQ 634, 638-40 (Fed.Cir.), cert. dismissed, 474 U.S. 976, 106 S.Ct. 340, 88 L.Ed.2d 326 (1985), this court approved a jury instruction that “the section 102 bar applies to ‘a completed invention that has been shown to be commercially useful for the purpose intended’ ” on the ground that “[t]he jury instruction focused attention on the factual question critical to this case, that is, whether the offers of sale involved ‘functional machines and processes.’ ” This court concluded that the on-sale bar was not satisfied, because “a reasonable jury could have found that the apparatus and method of the claims were not functional” by the critical date. Id. As in Dybel, the Shatterproof Glass court never specifically mentioned “reduction to practice.”
In Great Northern Corp. v. Davis Core & Pad Co., 782 F.2d 159, 164-65, 228 USPQ 356, 358 (Fed.Cir.1986), this court employed the following analysis:
The district court concluded, correctly we hold, that the invention was not reduced to practice until after February 28, 1977, and, therefore, the testing prior to that date did not constitute a § 102(b) bar. The ’732 support was not reduced to practice until it was sufficiently tested to demonstrate that it would work for its intended purpose, and that did not occur, in our view, until a location for the recesses, as defined in the claims, was determined that eliminated the cracking problem.
782 F.2d at 165, 228 USPQ at 358 (citations omitted).
A full reading of the Dybel, Shatterproof Glass, and Great Northern decisions makes it apparent that the parties did not raise and the court did not squarely address the issue of whether reduction to practice is an indispensable requirement of the on-sale bar. In General Electric and Barmag, consideration of the issue was dicta, however well considered. In Western Marine, the court did not explicitly hold that there was or was not a reduction to practice of the claimed invention. It, therefore, cannot be said that this court has taken a definitive position either way on the issue we address here. Cf. NLRB v. Boeing Co., 412 U.S. 67, 72, 93 S.Ct. 1952, 1955, 36 L.Ed.2d 752 (1973) (premise assumed in earlier cases is rejected when court was, at last, “squarely presented with the issue”); Lear, Inc. v. Adkins, 395 U.S. 653, 663, 89 S.Ct. 1902, 1907, 23 L.Ed.2d 610, 162 USPQ 1, 5 (1969) (Court receded from earlier endorsements of “licensee estoppel” as not “considered”).
The case law of other courts regarding the on-sale bar is not uniform. Some courts have rejected any rigid rules for the operation of the statutory bar, focusing, as much of our precedent does, on the policies of the statute. Chief Judge Wright’s comments in Philco Corp. v. Admiral Corp., 199 F.Supp. 797, 815, 131 USPQ 413, 428-29 (D.Del.1961), are as apt today as when made in 1961:
The cases dealing with § 102(b) of the Patent Act are in a state of confusion resulting in part from an attempt to establish hard and fast rules of law based upon overly refined legal distinctions. The area sought to be governed by these rules, however, encompasses an infinite variety of factual situations which, when viewed in terms of the policies underlying § 102(b), present an infinite variety of legal problems wholly unsuited to mechanically-applied, technical rules.
The regional circuits that have considered the question have given lip service to a requirement of reduction to practice as *655 part of the on-sale bar.[8] However, when faced with a specific factual situation which appeared to fall within the intent of the statutory bar but did not technically satisfy the requirements for reduction to practice, these courts have stepped back from a rigid application of that requirement. In such cases, in an attempt to shoehorn the reduction to practice concept into the on-sale bar analysis, the courts looked to see whether the invention was “sufficiently” reduced to practice for purposes of the bar. See, e.g., Dart Indus., Inc. v. E.I. DuPont DeNemours & Co., 489 F.2d 1359, 1365, 179 USPQ 392, 396 (7th Cir.1973). In this case, the government appears to urge such a position.
Adoption of a “sufficiently” reduced-to-practice requirement is in fact an abandonment of reduction to practice as that term is used in other contexts. This court observed in Barmag, 731 F.2d at 838 n. 6, 221 USPQ at 567 n. 6, that our case law does not support a variegated definition of reduction to practice. At this point, we point out that “reduction to practice” is a term of art which developed in connection with interference practice to determine priority of invention between rival claimants. See note 6, supra. In that context Judge Rich has said: “There are no degrees of reduction to practice; either one has or has not occurred.” Wolter v. Belicka, 409 F.2d 255, 262, 161 USPQ 335, 340 (CCPA 1969) (Rich, J., dissenting). It can only cause confusion in interference law, with its special technical considerations, and in operation of the on-sale bar, which is guided by entirely different policies, to adopt modifiers in connection with “reduction to practice,” whatever the context.
Moreover, since reduction to practice is a term of art under this court’s precedent, any specific ruling in one context on whether there is or is not a “reduction to practice” necessarily carries over into the other. For example, a holding here, like the trial court’s, that there can be a reduction to practice without an embodiment containing all elements of the claim would have a major unintended impact on interference law. Conversely, by invoking reduction to practice as developed in interference law, an inventor might be able to escape the on-sale bar simply through deft claim draftsmanship.[9]
Finally, a major flaw in reduction to practice as a per se requirement of the on-sale bar in all cases is disclosed by a close analysis of Timely Products, the leading case which purports to adopt that requirement. A significant development with respect to the scope of section 102(b) occurred in a series of decisions beginning with those of another of our predecessors, the Court of Customs and Patent Appeals, when it recognized the operation of the bar in conjunction with the obviousness determination under section 103. In In re Foster, 343 F.2d at 988, 145 USPQ at 173, that court held:
[S]ince the purpose of the statute has always been to require filing of the application within the prescribed period after the time the public came into possession of the invention, we cannot see that it makes any difference how it came into such possession, whether by a public use, a sale, a single patent or publication, or by combinations of one or more of the foregoing. In considering this principle, we assume, of course, that by these means the invention has become obvi *656 ous to that segment of the “public” having ordinary skill in the art. Once this has happened, the purpose of the law is to give the inventor only a year within which to file and this would seem to be liberal treatment.
Accord Argus Chem. v. Fibre Glass-Evercoat, 759 F.2d 10, 14, 225 USPQ 1100, 1103 (Fed.Cir.1985); In re Kaslow, 707 F.2d 1366, 1374, 217 USPQ 1089, 1095 (Fed.Cir.1983); In re Corcoran, 640 F.2d at 133, 208 USPQ at 869.
Implicit in the operation of a sections 102(b)/103 bar is the absence of reduction to practice of the claimed invention as a requirement for the bar to operate. The invention, i.e., as claimed with all elements, is not the subject of the sale. If it were, section 103 would not be involved. With respect to non-claimed subject matter of the sale in a sections 102(b)/103 situation, it is meaningless to speak of “reduction to practice” of what was sold. “Reduction to practice” relates only to the precise invention expressed in a claim. Thus, the second requirement of Timely Products, reduction to practice of the claimed invention, is inherently inconsistent with the first requirement under which the bar is applicable if the claimed invention is merely “obvious in view of the thing offered for sale.”
In view of all of the above considerations, we conclude that reduction to practice of the claimed invention has not been and should not be made an absolute requirement of the on-sale bar.
We hasten to add, however, that we do not intend to sanction attacks on patents on the ground that the inventor or another offered for sale, before the critical date, the mere concept of the invention. Nor should inventors be forced to rush into the Patent and Trademark Office prematurely. On the other hand, we reject UMC’s position that as a matter of law no on-sale bar is possible unless the claimed invention has been reduced to practice in the interference sense.
We do not reject “reduction to practice” as an important analytical tool in an on-sale analysis. A holding that there has or has not been a reduction to practice of the claimed invention before the critical date may well determine whether the claimed invention was in fact the subject of the sale or offer to sell or whether a sale was primarily for an experimental purpose. A holding that there is a reduction to practice of the claimed invention “may, of course, lighten the burden of the party asserting the bar.” General Electric, 206 USPQ at 271. Thus, we simply say here that the on-sale bar does not necessarily turn on whether there was or was not a reduction to practice of the claimed invention. All of the circumstances surrounding the sale or offer to sell, including the stage of development of the invention and the nature of the invention, must be considered and weighed against the policies underlying section 102(b). See In re Brigance, 792 F.2d 1103, 1107-08, 229 USPQ 988, 991 (Fed.Cir.1986); Western Marine, 764 F.2d at 845, 226 USPQ at 337.
The above conclusion does not lend itself to formulation into a set of precise requirements such as that attempted by the Timely Products court. However, we point out certain critical considerations in the on-sale determination and the respective burdens of proof which have already been established in our precedent. Thus, without question, the challenger has the burden of proving that there was a definite sale or offer to sell more than one year before the application for the subject patent, and that the subject matter of the sale or offer to sell fully anticipated the claimed invention or would have rendered the claimed invention obvious by its addition to the prior art. Cf. D.L. Auld, 714 F.2d at 1150, 219 USPQ at 17 (102(b) only). If these facts are established, the patent owner is called upon to come forward with an explanation of the circumstances surrounding what would otherwise appear to be commercialization outside the grace period. See Smith & Griggs Mfg. Co. v. Sprague, 123 U.S. 249, 8 S.Ct. 122, 31 L.Ed. 141 (1887); D.L. Auld, 714 F.2d at 1150, 219 USPQ at 17; In re Dybel, 524 F.2d at 1400, 187 USPQ at 598, and cases cited therein. The possibilities of such circumstances can *657 not possibly be enumerated. If the inventor had merely a conception or was working towards development of that conception, it can be said there is not yet any “invention” which could be placed on sale. A sale made because the purchaser was participating in experimental testing creates no on-sale bar. See, e.g., Great Northern, 782 F.2d at 165, 228 USPQ at 358.
V
The issue of whether an invention is on sale is a question of law. Barmag, 731 F.2d at 836-37, 221 USPQ at 565-66. Because the Claims Court’s factual findings are not disputed, and the issue may be resolved by application of the proper rule of law to those findings, we need not remand. Icicle Seafoods, Inc. v. Worthington, 475 U.S. 709, 106 S.Ct. 1527, 1530, 89 L.Ed.2d 739 (1986); Panduit Corp. v. Dennison Mfg. Co., 810 F.2d 1561, 1565, 1 USPQ 2d 1593, 1595 (Fed.Cir.1987).
UMC made a definite offer to sell its later patented UMC-B accelerometer to the Navy more than one year prior to the date of the application for the patent in suit. In its bid, UMC specified a price of $404.00 for each sensor component of the ACA and $271.00 for the compatible recorder component. The total contract price was in excess of $1.6 million. This written offer which revealed use of the analog transducer in the ACA was supplied on July 27, 1967. UMC admits that the offer it made was for profit, not to conduct experiments.
UMC’s activities evidence, at least prima facie, an attempt to commercialize the invention of the ’513 patent by bidding on a large government contract more than one year prior to the filing of the underlying application and thereby to expand the grace period in contravention of the policies underlying the statute. See Gould Inc. v. United States, 579 F.2d 571, 583, 198 USPQ 156, 167 (Ct.Cl.1978).
Countering the prima facie case, UMC offers only the purely technical objection that no complete embodiment of the invention existed at the time of the sale. In this case, that circumstance is unavailing when we look at the realities of the development of this invention. While UMC asserts that its improved ACA required further “development,” as evidenced by its seeking a waiver of the liquidated damages provision in the RFP, that fact might weigh in UMC’s favor if UMC had sought by convincing evidence to prove that the primary purpose of the sale was for experimental work. However, the contract was not a research and development contract, and UMC admits that the offer it made was for profit, not to conduct experimental work.
We do not attempt here to formulate a standard for determining when something less than a complete embodiment of the invention will suffice under the on-sale bar. However, the development of the subject invention was far beyond a mere conception. Much of the invention was embodied in tangible form. The prior art devices embodied each element of the claimed invention, save one, and that portion was available and had been sufficiently tested to demonstrate to the satisfaction of the inventor that the invention as ultimately claimed would work for its intended purpose. Thus, we conclude from the unchallenged facts with respect to the commercial activities of UMC, coupled with the extent to which the invention was developed, the substantial embodiment of the invention, the testing which was sufficient to satisfy the inventor that his later claimed invention would work, and the nature of the inventor’s contribution to the art, that the claimed invention was on sale within the meaning of section 102(b).
Accordingly, we hold all claims of the ’513 patent invalid. That issue being determinative of the case, we vacate the remainder of the Claims Court opinion.[10]
AFFIRMED ON DIFFERENT GROUNDS.
VACATED-IN-PART.

. 35 U.S.C. § 102 provides in pertinent part:
§ 102. Conditions for patentability; novelty and loss of right to patent
A person shall be entitled to a patent unless
(b) the invention was ... on sale in this country, more than one year prior to the date of the application for patent in the United States____

. The patent claims read as follows:
1. An accelerometer for counting the number of times each of a plurality of acceleration maneuvering loadings of predetermined magnitude of an aircraft occur, comprising means adapted to be mounted to an aircraft for sensing acceleration loading thereof, means providing a signal proportional to said accelerations, a plurality of sensing and storing means each responsive to an acceleration signal reaching a different predetermined value for sensing such signal and storing an indication of the value reached, a plurality of acceleration level recording means, timing means for timing a predetermined cycle and furnishing a signal indicative of the end of said timing cycle, means responsive to an acceleration signal reaching a reference level for causing said timing means to initiate a timing cycle, means responsive to said end of cycle signal arranged to pass a signal from each of said sensing and storing means to an associated one of said recording means.
2. The accelerometer of claim 1 further including means for filtering high-frequency components from the signal waveform.
3. The accelerometer of claim 1 wherein said means for recording comprises a plurality of counters, each counter arranged to be advanced by one of said sensing and storing means, said means for passing comprises a plurality of gates, each of said gates being arranged to apply an advance signal from one of said sensing and storing means to a respective one of said counters.
4. The accelerometer of claim 1 further including means for sensing when the signal exceeds said reference value, and disabling said sensing and storing means if the signal falls below said threshold value.

. The parties sometimes use the term “transducer” to identify the entire sensor portion of the ACA and at other times merely a component of that sensor portion. Weaver did not invent the analog transducer used in his sensor. He used the Kistler analog transducer which was both a commercial product and prior art. U.S. Patent No. 3,323,372, issued June 6, 1967, to Kistler.

. While in Corcoran, the Court of Customs and Patent Appeals stated that it agreed with the "principles” of Timely Products, only the first requirement of the Timely Products test was there in issue. Barmag Barmer Maschinenfa-brik AG v. Murata Mach., Ltd., 731 F.2d 831, 221 USPQ 561, 565 (Fed.Cir.1984). The patent owner had offered for sale a component of the claimed invention. The court held that the inventor had lost his right to a patent by reason of the one-year time bar of section 102(b) coupled with the non-obviousness provision of section *651 103 under the principles of law enunciated in In re Foster, 343 F.2d 980, 145 USPQ 166 (1965), cert. denied, 383 U.S. 966, 86 S.Ct. 1270, 16 L.Ed.2d 307, 149 USPQ 906 (1966). This type of loss of right, which we have termed a sections 102(b)/103 bar, will be discussed more fully infra.

. The public use bar of section 102(b) implicates different considerations and nothing said here should be construed to encompass that part of the statute.

. A panel of this court is bound by prior prece-dential decisions unless and until overturned in banc. Kimberly Clark Corp. v. Fort Howard Paper Co., 772 F.2d 860, 863, 227 USPQ 36, 37 (Fed.Cir.1985); Mother's Restaurant, Inc. v. Mama's Pizza, Inc., 723 F.2d 1566, 1573, 221 USPQ 394, 400 (Fed.Cir.1984). The decisions of the United States Court of Claims and the United States Court of Customs and Patent Appeals have been adopted as precedent. South Corp. v. United States, 690 F.2d 1368, 1371, 215 USPQ 657, 658 (Fed.Cir.1982).

. Trial Judge Browne observed:
Reduction to practice is a term of art which arose out of the highly technical patent interference practice wherein the issue to be determined, as between contesting applicants, is which of the contestants was the first inventor, and thus is entitled to receive the patent on the invention. The term is found in § 102(g) of the Patent Act. There, reduction to practice is to be taken into account in "determining priority of invention.” Nevertheless, some courts have considered proof of reduction to practice to be relevant in determining whether certain sales activities constitute a bar to patent validity under § 102(b). See, e.g., Timely Products Corp. v. Arron, supra. Even assuming the validity of such decisions, however, it does not necessarily follow that proof of reduction to practice is indispensable in every case involving an "on sale” bar. Availability of such proof may, of course, lighten the burden of the party asserting the bar.
General Elec. Co. v. United States, 206 USPQ 260, 271 (Ct.Cl.Tr.Div. 1979), aff'd on other grounds, 654 F.2d 55, 211 USPQ 867 (Ct.Cl.1981) (en banc).

. E.g. Dataq, Inc. v. Tokheim Corp., 736 F.2d 601, 605, 222 USPQ 677, 680 (10th Cir.1984); Stewart-Warner Corp. v. City of Pontiac, 717 F.2d 269, 273-74, 219 USPQ 1162, 1166 (6th Cir.1983); Digital Equip. Corp. v. Diamond, 653 F.2d 701, 718, 210 USPQ 521, 540 (1st Cir.1981); Austin v. Marco Dental Prod., Inc., 560 F.2d 966, 970, 195 USPQ 529, 532 (9th Cir.), cert. denied, 435 U.S. 918, 98 S.Ct. 1477, 55 L.Ed.2d 511, 197 USPQ 448 (1978); CTS Corp. v. Piher Int'l Corp., 527 F.2d 95, 103, 188 USPQ 419, 425 (7th Cir.), cert. denied, 424 U.S. 978, 96 S.Ct. 1485, 47 L.Ed.2d 748, 189 USPQ 384 (1976).

. Weaver could have claimed “an aircraft with an accelerometer ...” instead of “an accelerom-eter____” In that instance, the claimed invention would not have been reduced to practice even if Weaver had built and tested the entire ACA. Correge v. Murphy, 705 F.2d at 1329, 217 USPQ at 755 (aircraft vent system not reduced to practice because not tested in aircraft as claimed).

. Prior to release of this opinion, an active judge called for a vote for in banc consideration. The request failed to receive a favorable majority of the votes of the active judges.