835 F.2d 871
 Unpublished Disposition
NOTICE: Federal Circuit Local Rule 47.8(b) states that opinions and orders which are designated as not citable as precedent shall not be employed or cited as precedent. This does not preclude assertion of issues of claim preclusion, issue preclusion, judicial estoppel, law of the case or the like based on a decision of the Court rendered in a nonprecedential opinion or order.
PACIFIC TECHNICA CORPORATION, Plaintiff-Appellant,
v.
The UNITED STATES, Defendant/Cross-Appellant.
 Nos. 87-1201, 87-1219.
 United States Court of Appeals, Federal Circuit.
 Nov. 18, 1987.
 
 Before FRIEDMAN, Circuit Judge, JACK R. MILLER, Senior Circuit Judge, and NIES, Circuit Judge.
 PER CURIAM.
 
 DECISION
 
 1
 Pacific Technica Corporation (Patec) appeals from the judgment of the United States Claims Court in Pacific Technica Corporation v. United States, 3 USPQ2d 1168 (Cl.Ct.1986), holding the government not liable under 28 U.S.C. Sec. 1498(a) (1982) for use of inventions claimed in U.S. Patent Nos. 3,714,900 ('900) and 3,786,760 ('760), which Patec owns by assignment from the inventor, Fritz K. Feldmann. With respect to the '900 patent (sabot patent), the court held that all claims were invalid for anticipation or obviousness but that, if valid, the United States had a limited license. The parties agree that if the government has a license it is not limited. With respect to the '760 patent (band patent), the court held the asserted claims invalid by reason of an on sale bar within the meaning of 35 U.S.C. Sec. 102(b) (1982). We affirm the court's ruling that the government has a license under the '900 sabot patent and that the government established the invalidity of the '760 band patent claims. We vacate the portion of the judgment holding that the government's license is limited and, because we do not address the issue, that the '900 patent is invalid. Thus, we affirm in part and vacate in part.
 
 OPINION
 
 2
 * The technology at issue involves spin-stablized sabot projectiles, or ballistics comprised of a subcaliber penetrator (core) and a discardable encasing sabot. Feldmann formed Patec to develop such technology, and the inventions disclosed in the '900 and '760 patents followed. The '900 patent claims a sabot projectile having a body which separates into petals and opens like an umbrella from its rear toward its front under centrifugal spin and overtaking muzzle gas forces. The '760 patent claims a band extending beyond the diameter of the projecting body to engage the gun barrel grooves and impart stabilizing spin to the projectile, and to dam high pressure powder gases behind the band to maximize propellant forces.
 
 II
 
 3
 In March 1967, at the suggestion of the government, Feldmann submitted a proposal to the United States Army to develop a new armor-piercing discarding sabot projectile which was either spin-stabilized or fin-stabilized. On June 27 and August 10, 1967, the Army saw test firings by Patec of a spin-stabilized projectile and on August 22-24, 1967, Feldmann gave a presentation assisted by slides, during which he discussed his spin-stabilized discarding sabot approach. On November 9, 1967, the Army then issued a contract (projectile contract) to Patec to fund development of a projectile. Feldmann filed the '900 application on August 29, 1969. The term of the Army's projectile contract ended in October 1970. Patec states that its work ended with the filing of a report, however, in February, 1969.
 
 
 4
 Patec contends that the government has no license under the '900 patent because the inventor reduced the invention to practice by August 1967 before entering the contract in November 1967. The parties agree that, if the claimed invention was reduced to practice during the projectile contract, then the government is entitled to an unlimited license under the patent.[1]
 
 
 5
 * Patec argues that the government failed to carry its burden of proof that the sabot invention was reduced to practice during the Army contract. More particularly, Patec asserts that the government had to prove that Patec's tests in June and August, 1967, which it asserts reduced the invention to practice, did not constitute such reduction. Contrary to Patec's view, the government did not have a specific burden to prove that negative. The government put forth its evidence of development under the contract, Patec submitted its evidence of reduction to practice before the contract date, and the court made a decision on the basis of all of the evidence that the government had established facts which lead to the legal conclusion that a reduction to practice occurred after the contract date. Also, in view of the manner in which the parties framed the issue, the court did not have to identify with more particularity the date on which the first actual reduction to practice occurred. The issue of whether evidence establishes that reduction to practice occurred after contract work had ended is not argued in the appeal; moreover, as far as we can determine, it was not raised below. The only question to be decided was, therefore, whether reduction to practice occurred before the contract date.
 
 
 6
 On that issue, the trial court found that spin-stabilizing developments were made during the contract as evidenced by Patec's own monthly reports to the government on such work; that such work was funded, at least in part, by the government under the contract; that such work was encompassed by the contract; and that such work led to a reduction to practice of the claimed invention under the contract. None of the court's factual findings are clearly erroneous and they lead, at least prima facie, to the conclusion that the government has a license under the '900 patent. As explained below, we are unpersuaded that the prima facie case is overcome by Patec's arguments of error by the trial court in reaching that conclusion.
 
 
 7
 Patec argues that the trial court applied an incorrect standard in determining the sufficiency of its pre-contract testing by requiring commercial perfection rather than workability of Feldmann's invention. Per Patec, the court required that the projectile contract's requirements be met. The court did refer to the armor piercing objective of the contract. Pacific Technica, 3 USPQ2d at 1193 n. 20. However, we cannot agree that the court used the contract requirement to defeat an accomplished reduction to practice. Rather, the court refused to find a reduction to practice in Patec's pre-contract tests because the conditions under which the claimed invention would be used had not been duplicated in the tests, and persons skilled in the art would require such testing before being satisfied that "the invention would work as intended."[2] See Eastern Rotorcraft Corp. v. United States, 384 F.2d 429, 431 (Ct.Cl.1967). Patec quotes the inventor's testimony to the effect that the June and August, 1967 tests showed that his spin-stabilized invention worked to a better degree than "a probability of failure." We are unpersuaded that this testimony shows that one of skill in the art would have been satisfied that the invention would work for its intended purpose after the 1967 tests.[3] See King Instrument Corp. v. Otari Corp., 767 F.2d 853, 861, 226 USQP 402, 407 (Fed.Cir.1985), cert. denied, 106 S.Ct. 1197 (1986).
 
 
 8
 Patec contends that the court rejected the sufficiency of the tests on the ground the firing was not under automatic conditions, which would be error because the '900 claims do not require that the round be fired under such conditions. This argument is wholly unsupportable. Addressing an argument concerning obviousness, the court noted that Patec never asserted that it had test fired the sabot invention under automatic conditions. The lack of tests under automatic conditions supported the inclusion of single-fire art in evaluating obviousness. Pacific Technica, 3 USPQ2d at 1182. The court specifically recognized that reduction to practice deals with elements of the claim and that automatic firing was not an element. It did not mention automatic firing in its reduction to practice analysis. We see no basis for drawing the inference of error Patec suggests.
 
 
 9
 Patec contended at trial that the projectile contract was for development of a fin-stabilized sabot only and that it did not develop the umbrella-type opening during the contract, use such opening in its work under the contract, or finance its development with contract funds. The Claims Court rejected these contentions, holding that the contract included work on a spin-stabilized sabot, as well as research which Patec admits is applicable to both types of sabots, and finding that Patec used contract monies to fund that work. Id. at 1191-92. Patec asserts that no evidence supports the court's rulings. We disagree.
 
 
 10
 With respect to the scope of the contract, the court stated:
 
 
 11
 [T]rial testimony makes it clear that it was the intent of both parties that the Army was not contracting for a compatible fin-stabilized sabot only, but also for new and advanced technology exploration.... [W]ritten amendments to the projectile contract ... show[ ] that the projectile contract encompassed more than fin-stabilized sabot alone. Furthermore, the monthly reports submitted by [Patec] to [the government] indicate that the projectile contract was not narrowly limited to only fin-stabilized sabot research and application.
 
 
 12
 Id. In particular, Monthly Report No. 2 states that fin-stabilized sabot petal "separation on exit from the muzzle [was] achieved in part by centrifugal force due to spin and in part by aerodynamic forces. Tests indicate that the four petals of the forward sabot element open from the rear and eventually split the unslotted shoulder." 3 USPQ2d at 1175. Thus, Patec's positions on the scope of the contract, its nondevelopment of the umbrella-type opening under the contract, and its nonuse of that opening in its work under the contract are wholly meritless.
 
 
 13
 Addressing Patec's use of contract monies to fund its spin-stabilized sabot development, the court examined Patec's time sheets. Those business records unequivocally evidence that time was charged to that development. Patec's assertion of complete separation of fin-stabilized and spin-stabilized work could not withstand that evidence, as the trial court held.
 
 
 14
 No error having been shown, we must affirm the trial court's judgment that the government has a license under the '900 patent.
 
 B
 
 15
 On cross-appeal, the government asserts that the 20mm limitation placed on the license by the Claims Court should be eliminated. Patec concedes that, if the government is entitled to a license under the '900 patent, the license is not limited in caliber to 20mm spin-stabilized sabots. Because the specification and claims of the '900 patent are not limited to any specific caliber and there is no evidence in the record to justify such a limitation, we agree that the court's finding which limits the government's license to 20mm sabots is erroneous. Accordingly, we vacate that portion of the court's decision limiting the license.
 
 III
 
 16
 The '760 patent claims an improvement in the shape of the seat for the rotating band in a sabot body intended to improve gas obturation by reducing leakage of muzzle gases between the band and its seat during firing. The seat is claimed as having smooth-knurl-smooth regions. Patec acknowledges that the '760 invention was actually reduced to practice by October 1970. On December 9, 1970, Patec offered to develop an optimized penetrator and in Task IX was to fabricate and deliver 300 complete rounds for General Dynamics. Patec's proposal was made more than one year before Patec applied for its '760 patent on June 1, 1972. On January 9, 1971, Patec submitted a revised proposal which was accepted by General Dynamics and resulted in a subcontract under General Dynamics' contract (the penetrator contract) with the Navy. Under the subcontract, Patec was to develop the optimized penetrator. Task IX (for 300 complete units) was eliminated.
 
 
 17
 The sole issue on appeal with respect to an on-sale bar is whether Patec's original offer to sell complete rounds was for devices embodying Patec's '760 band configuration. We have considered all of Patec's arguments attacking the court's ruling and are unpersuaded of reversible error.
 
 
 18
 Patec argues that its original proposal to General Dynamics did not include the configuration of the seat for the band because the "overall configuration of the deliverable items," i.e., the complete rounds, was unknown and would be determined in the course of the program; that the contract was for the development of the penetrator, not the sabot; and that Patec did not intend to include the '760 invention in its proposal.
 
 
 19
 The trial court considered each of these arguments and found them unpersuasive. We are also unpersuaded of legal or factual error in the court's conclusion. Patec does not dispute that the penetrator and sabot together make a projectile, i.e., a complete round, and that the penetrator had to be compatible with Patec's 20SSDS (spin-stabilized) sabot. A drawing in evidence discloses that the band configuration in issue is entitled "20SSDS Sabot Base." Further, Patec's proposal to General Dynamics refers to "the proven PATEC 20SSDS discarding sabot." The trial court concluded that "the contracted optimization of plaintiff's penetrator under the GD purchase order enjoyed the incorporation of the band patent art as an integral part of the success of the penetrator's performance." 3 USPQ2d at 1180. The court's holding on this issue has not been shown erroneous as a matter of fact or law. That the proposal was not accepted does not defeat the on-sale bar. UMC Elecs. Co. v. United States, 816 F.2d 647, 653, 2 USPQ2d 1465, 1469 (Fed.Cir.1987).
 
 IV
 
 20
 In sum, we affirm the Claims Court's determination that the government is entitled to a license under Patec's '900 patent. We vacate that judgment insofar as it limits the license to 20mm caliber spin-stabilized sabot projectiles compatible with the Navy's Phalanx system. Also, because we do not address the issues relating to validity of the '900 patent, we vacate that part of the judgment. The Claims Court's determination that Patec's '760 patent is invalid because the invention was on sale in the United States more than one year before Patec's application for the '760 patent was filed is affirmed.
 
 AFFIRMED IN PART; VACATED IN PART
 
 
 [1]
 The Claims Court limited the government's license "to the 20mm spin-stabilized sabot that is compatible with the Phalanx system...." Pacific Technica, 3 USPQ2d at 1193
 
 
 [2]
 We note that a stated objective of the invention is superior armor piercing
 
 
 [3]
 We need not discuss the other deficiencies in proof asserted by the government, e.g., that the inventor's testimony was uncorroborated; that there is no evidence that, in the tests, the sabot petals first opened from the rear; or that there was rear end "fracturing."