AMENDED OPINION AND ORDER
MUKASEY, District Judge.
Defendant The Lockformer Company moves to dismiss this patent infringement action on two grounds: first, that all of the claims in one of the two patents in suit and two of the claims in the other are invalid because one of the inventions at issue was on sale more than one year before a patent application was filed; second, that plaintiffs failure to disclose to the patent examiner prior art and plaintiff’s own sales activity constitutes inequitable conduct rendering both of plaintiff’s patents unenforceable. Alternatively, Lockformer seeks a bench trial limited to the inequitable conduct issue. For the reasons set forth below, the motions are denied.
I.
A motion for summary judgment is properly granted only “if the pleadings, depositions ... together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.” Fed.R.Civ.P. 56. In patent cases, no less than in other cases, “[t]he moving party bears the burden of demonstrating the absence of any genuine issue of material fact,” and the trial court “must view the evidence in the light most favorable to the nonmovant and must draw all reasonable inferences in the nonmovant’s favor.” A.B. Chance Co. v. RTE Corp., 854 F.2d 1307, 1310-11 (Fed.Cir.1988). However, once a movant meets that burden, and establishes a prima facie case for summary judgment, the opponent of summary judgment must adduce enough evidence to support a jury verdict in its favor. RTE Corp., 854 F.2d at 1311; Avia Group Int’l, Inc. v. L.A. Gear California, Inc., 853 F.2d 1557, 1560 (Fed.Cir.1986).
II.
Applying those principles, the facts are as set forth below. Plaintiff Construction Technology, Inc. (“CTI”) is the owner of two patents, nos. 4,554,635 (the “ ’635 patent”) and 4,551,810 (the “ ’810 patent”) issued on the basis of applications filed commencing on July 28, 1982 and covering devices for the computerized manufacture and design of heating, ventilating and air conditioning (“HVAC”) ducts used in buildings.
As appears from the parties’ papers, after the structure of a building itself has been planned, and the electricity and plumbing lines have been laid out in straight lines as they must be, HVAC ducts are custom designed and built to fit into the remaining space. In practice, this means the ducts must be made to turn and meander over, under and around pipes, conduits and structural supports, requiring custom designed joints called fittings at each point where the duct must change direction. Although these fittings can vary *102 infinitely in size, certain basic shapes recur {e.g., elbow — to connect ducts oriented at 90 degrees to one another; transition — to connect ducts of varying perimeter dimensions; etc.). (Def.Ex. MDX-2, col. 25, claim 8) Historically, such custom design and construction consumed substantial time and the skilled labor of sheet metal workers.
Beginning in 1970, plaintiff’s president Richard W. Levine began to develop systems and devices to automate and rationalize the process of designing and manufacturing HVAC fittings. (Declaration of Richard W. Levine, dated May 6,1988 (“Levine Dec.”) If 5) Initially he developed a method, equivalents of which were also employed by others in the field, for calculating automatically the minimum size of the metal rectangles or “blanks” required for each of the custom fittings used in an HVAC duct system. Later versions of this so-called blanking system, also employed by others, would indicate the arrangement of these blanks on a piece or roll of sheet metal so as to minimize the amount of sheet metal used to create the fittings, and would label each blank with a rudimentary diagram showing the shape of the fitting setting forth its key dimensions. (Levine Dec. If 5) Plaintiff’s system was called Com-puduct; defendant’s competitive system was called Duct Magic. These blanking systems, however, still required a skilled sheet metal worker, called a layout technician, to plot manually the outline of the fitting on a piece of metal before it could be cut. (Levine Dec. 1I1f 5-6)
The ’635 patent describes a system called Auto Plot that obviates use of a layout technician. In essence, it permits a computer operator to enter a basic fitting type —e.g., elbow — and certain specified dimensions. The computer then makes additional calculations so as to generate the perimeter geometry of each piece. This information is then fed into a plotting table, adapted from a standard device used to draw or plot patterns in the garment industry, which then lays out the pattern of the piece on the metal and locates it so as to minimize consumption of metal. If the plotting table is fitted with a laser cutting head instead of a head that simply draws or plots, the pieces can be cut automatically rather than simply laid out. The ’810 patent describes a system called Auto Plan that uses a computer to help design an HVAC duct system in relation to the architectural, plumbing, electrical and other features of the building. The ’810 patent for Auto Plan is relevant here insofar as two of its claims also cover the ’635 patent for Auto Plot. (Def.Ex. MDX-3, cols. # 36-37 claim 11, and cols. 39-40 claim 22)
Because plaintiff's first application, continued in the application that ultimately resulted in the ’635 patent, was submitted on July 28, 1982, the date of July 28, 1981 is critical in that placement of the Auto Plot device on sale before then would invalidate the ’635 patent and the two claims in the ’810 patent covering that device. 35 U.S.C. § 102(b).[1] The activity alleged by Lockformer to violate that on-sale bar began in November 1980 with a press release and press conference to announce the development of Auto Plot. (Def.App. A, p. B14; Def.Ex. MDX-10) It continued in late 1980 or early January 1981 with plaintiff’s letter to Compuduct owners proclaiming, in sonorities more suggestive of the publicist than of the layout technician, “a breakthru that will revolutionize duct fabrication as we know it!” The letter, signed by Levine, (Def.Ex. MDX-13) announced the development of Auto Plot, and disclosed, “On 6/19/80 I viewed the first running of the Compuduct Auto-Plottra at the factory. Even though I was involved in it’s [sic] planning for the past 3 years, I found it hard to believe!” {Id.)
At the January 1981 trade show of the American Society of Heating, Refrigeration and Air Conditioning Engineers (“ASH-RAE”), plaintiff had a booth with a computer and a plotting table that was turning out patterns for HVAC fittings. (Def.App. A, pp. 205-213) Plaintiff at that time solic *103 ited orders for the Auto Plot, at an introductory show price of about $140,000, which was about $50,000 below the proposed selling price for the device, and received four such orders. (Def.Ex. MDX-18) These orders were reflected on invoices that recited no secrecy restrictions and indicated no obligation by the buyer to conduct or report on tests or experiments.
Plaintiff avers, and Lockformer does not seem to challenge with a contrary showing, that the disolay at the ASHRAE show was a mere mock-up with a non-operating computer and a plotting table that was turning out the same patterns over and over again from a pre-punched tape. (Levine Dec. II11) More significantly, plaintiff avers further that notwithstanding the ballyhoo before and during the show, at the time customers were placing orders at the show, “The software for the Auto Plot system did not yet exist.” (Levine Dec. 1112) This seems to be borne out by the testimony of a vice president of one of the two customers that received the first shipment of Auto Plot components:
“Q Did he tell you what had to be done before the machine was ready?
A All I know from him was that his portion of the work, in effect, the programs as such, were not prepared.” (Pl.App.Exh. A, pp. 20-21)
Components for the Auto Plot devices were shipped in July 1981 to two of the customers who had placed orders at the January 1981 ASHRAE show, and were set up on their premises some time after the July 28, 1981 critical date. (Levine Dec. IT 19) Plaintiff’s president, Levine, contends that it took months for the software to be developed to the point where the machines would turn out HVAC fittings consistently and in different sizes so that the system could be said to be fit for the purpose for which it was designed. His description of what occurred at one of the companies, Grunau Co., Inc., is in representative part as follows:
"The most troublesome aspect of the continuing problems and errors was that they were unpredictable. They occurred with all types of fittings, and they occurred even after a fitting type appeared to be operating satisfactorily for only slightly different sizes. For example, modifications would be made to cause the machine to draw a series of graduated sizes of elbows or transitions correctly only to have the next size inexplicably drawn incorrectly. The errors and problems included unusable overlapping patterns, unusable patterns which ran off the edge of the metal and patterns which caused the machine to inexplicably stop, freeze and refuse to restart. All of these problems rendered the machine completely unusable for its intended purpose.” (Levine Dec. II21)
That account is substantially confirmed by the testimony of Grunau employees. See, e.g., Pl.App.Exh. A, pp. 36-42, 50-51. As one of them put it, “We expected to be the guinea pigs.” Id. at 67. Much the same thing occurred at the premises of the other early recipient of the Auto Plot system, F.E. Moran, Inc. (Pl.App.Exh. I, pp. 9-12; Levine Dec. MI 22-23)
Levine made it plain at his deposition that the invention as described in the ’635 patent was changed, substantially in his view, by the ongoing revisions he was performing after July 28, 1981, as follows:
“Q. Let’s see if I understand it. The program at that time that you took the tape out to Grunau, the program was complete to the extent that it was to perform these 104 positions that are referred to on pages 9 and 10 of the 635 patent, but you couldn’t get consistent results because of glitches and bugs, is that accurate?
A. No. As I told you before, the positions that are indicated in the patent and the several steps documented in figure number — in columns 7 and 8—
Q. Just a second, let me get it. Okay.
A. (Continuing) — which reflects 104 positions plus reverse and mirror imaging, approximately I would say forty to fifty percent of the eventual positions we have indicated there, were the result of subsequent development following the first installation. However, of the 104, let’s say, initial plots we anticipated, we still *104 had fairly consistent problems in getting those to function because of the complexity of implementing the program to do this with all sizes and all different customized configurations.” (Pl.App.Exh. G, pp. 86 — 87)
Plaintiff received a letter dated June 8, 1982 from counsel to a potential competitor inquiring about the patent status of the Auto Plot system. (Def.Exh. MDX-4) Lockformer contends it was this letter that “precipitated a last ditch, mad-rush effort to salvage patent rights which had, by that time, already lapsed and become part of the public domain.” (Def.Mem. p. 3) CTI, of course, says otherwise. In any event, as noted above, CTI’s initial application was filed July 28, 1982.
III.
Whether Lockformer has made a prima facie case for summary judgment and whether, even if it has, there is a sufficient factual dispute to warrant denying the motion depends, in turn, on the outcome of a legal dispute between the parties as to the standards governing when an invention has been placed on sale so as to invalidate a patent issued pursuant to an application filed more than a year later. For more than a decade before 1987, there could be little doubt that those standards were to be found in the opinion of Judge Conner of this court, writing for a panel of the Second Circuit in Timely. Products Corp. v. Arron, 523 F.2d 288, 302 (2d Cir.1975), as follows:
“(1) The complete invention claimed must have been embodied in or obvious in view of the thing offered for sale. [citations omitted]_
(2) The invention must have been tested sufficiently to verify that it is operable and commercially marketable. This is simply another way of expressing the principle that an invention cannot be offered for sale until it is completed, which requires not merely its conception but its reduction to practice, [citation omitted] (8) Finally, the sale must be primarily for profit rather than for experimental purposes, [citations omitted]”
In 1987, the Court of Appeals for the Federal Circuit, to which Congress has committed exclusive jurisdiction to hear appeals in patent cases, 28 U.S.C. §§ 1292(c), 1295, decided UMC Elecs. Co. v. United States, 816 F.2d 647 (Fed.Cir.1987), cert. denied, — U.S. -, 108 S.Ct. 748, 98 L.Ed.2d 761 (1988), in which that Court held that a showing of reduction to practice “has not been and should not be made an absolute requirement of the on-sale bar.” 816 F.2d at 656. Defendant argues strenuously that that language diminishes virtually to invisibility the second of the three elements listed in Timely Products, and makes the plaintiffs evidence of its ongoing difficulties and revisions following the ASHRAE show relevant, if at all, only to the issue of whether sales at that show were for an experimental rather than a commercial purpose. Alternatively, defendant argues that the Auto Plot system was in fact reduced to practice to the extent that the cases and the patent itself require. However, I believe defendant places more weight on the quoted segment of UMC Electronics than it will bear, and that there are material factual issues as to the state of development of the invention at the time CTI made its presentation at the ASHRAE show in January 1981 and thereafter.
Even the holding quoted above provides a clue that UMC Electronics cannot be read as broadly as defendant might wish. The Court held simply that reduction to practice is not “an absolute requirement of the on-sale bar.” (emphasis added) That is to say, the absence of reduction to practice may not itself prevent application of the on-sale bar, but there is nothing to prevent its being considered along with other factors in determining whether the invention is “operable and commercially marketable,” Timely Products, 523 F.2d at 302, i.e., whether “the invention as ultimately claimed would work for its intended purpose.” UMC, 816 F.2d at 657. As the same Court held in RTE Corp., 854 F.2d at 1311, relying explicitly on UMC Electronics itself to reverse an award of summary judgment, “all of the circumstances sur *105 rounding the offer to sell, including the stage of development of the invention, must be considered. UMC Elecs. Co. v. United States, ... ‘If the inventor had merely a conception or was working towards development of that conception, it can be said there [was not] ... any “invention” which could [have been] placed on sale/ at the time of the offer. UMC, 816 F.2d at 657, 2 USPQ2d at 1472.” Once again, the range of factors considered by the Court in UMC Electronics before justifying an award of summary judgment was broad, as follows:
“Much of the invention was embodied in tangible form. The prior art devices embodied each element of the claimed invention, save one, and that portion was available and had been sufficiently tested to demonstrate to the satisfaction of the inventor that the invention as ultimately claimed would work for its intended purpose. Thus, we conclude from [1] the unchallenged facts with respect to the commercial activities of UMC, [2] coupled with the extent to which the invention was developed, [3] the substantial embodiment of the invention, [4] the testing which was sufficient to satisfy the inventor that his later claimed invention would work, and [5] the nature of the inventor’s contribution to the art, that the claimed invention was on sale within the meaning of section 102(b).” 816 F.2d at 657.
In this case, notwithstanding that defendant has proffered some evidence of CTI’s testing of the system before it was delivered to Grunau and F.E. Moran, and accepting that CTI’s activities before and at the ASHRAE show were prima facie commercial, there are substantial issues with respect to “the extent to which the invention was developed, the substantial embodiment of the invention, [and whether] testing ... was sufficient to satisfy the inventor that his later claimed invention would work.” Id. If CTI’s evidence is to be believed, as it must be on this motion unless it is so improbable or suspect as to warrant outright rejection, the software that was crucial to the invention was nowhere near a commercial stage of development at and after the ASHRAE show, and did not approach that stage until months after the machines were placed on the premises of Grunau and F.E. Moran when a process of iteration and reiteration of computer programs finally yielded an invention that could be described as one that “would work for its intended purpose.” UMC, 816 F.2d at 657. Here it is important to stress that the machines that were part of this invention — the computer and the plotting table — were prior art and not themselves the heart of the invention. Rather, it was the software, which enabled the creation of patterns and fittings without the participation of a skilled layout technician, that was the heart of the invention. Lockformer has objected strenuously that the software was not part of the invention claimed in the patent application, and accordingly that its state of development cannot prevent application of the on-sale bar. But both patent applications recite in English and in mathematical formulas and instructions the steps or program for positioning the patterns of the various fittings. See, e.g., cols. 7-10, 15-20 and Figs. 20A and 20B of the ’635 patent. Moreover, Levine’s deposition testimony quoted above (see p. 103, supra) makes it plain that the description of the invention in the ’635 patent was changed as a result of these ongoing revisions. It is at least an issue of fact whether these steps disclosed in the patents were completed before the critical date, or were either sufficiently obvious or constituted routine debugging such that they need not have been completed in order for the on-sale bar to apply.
In addition, it bears mention that among the inferences to be drawn in plaintiff’s favor is that the public relations blather surrounding the introduction of the Auto Plot at and before the ASHRAE show cannot be taken literally for purposes of this motion to mean that the invention had been fully tested at that time.
Lockformer argues as well that “the invention as claimed ... is not concerned with ... commercial realities” such as the device’s ability to produce a substantial range of the fittings that a customer might need. “The patented AUTOPLOT,” defen *106 dant maintains, “as distinguished from the commercial AUTOPLOT, doesn’t care how many different types of fittings can be produced, only that it can produce at least some, or even just one fitting.” (Def.Mem. p. 33) (emphasis in original) Because certain of the claims in the ’635 patent speak, for example, of “a three dimensional product” (Def.Exh. MDX-2, col. 25, claim 1) or otherwise use the singular, or use plural forms that do not make it explicit that more than two specimens may have to be produced, defendant asserts, so long as even preliminary tests of the Autoplot produced two commercially usable fittings, the device, if sold, was “on sale” for purposes of the statute. Only by violating Judge Learned Hand’s oft-quoted admonition that, “There is no surer way to misread any document than to read it literally ...” Guiseppi v. Walling, 144 F.2d 608, 624 (2d Cir.1944) (concurring opinion), aff'd sub nom. Gemsco, Inc. v. Walling, 324 U.S. 244, 65 S.Ct. 605, 89 L.Ed. 921 (1945), can the ’635 patent be read to yield the bizarre result that an expensive piece of equipment will be regarded as fit “for its intended purpose,” UMC, 816 F.2d at 657, when it cannot produce what it was designed to produce in a fashion that would justify a customer’s investment in it. At a minimum, as noted above, there is an issue of fact as to whether the invention on the critical date was in such a condition that its failure to produce patterns for fittings over the range required to make it useful was a shortcoming that was “solvable by routine debugging, setup, and installation adjustments,” Application of Theis, 610 F.2d 786, 793 (CCPA 1979), in which event the on-sale bar would apply, or not.
Insofar as defendant claims that permitting the kind of sales activity encountered here without invoking the on-sale bar will defeat the policy against permitting an inventor to exploit his invention for longer than the statutory period, I believe that in a case such as this, and again particularly at the summary judgment stage, I must view such a danger as quite limited. “Until at least an operative prototype has been completed and tested, the competitive effectiveness of such [sales] activity, in all probability, will be impaired by the aura of continuing developmental, éxperimental and testing effort.” Amerio Contact Plate Freezers, Inc. v. Belt-Ice Corp., 316 F.2d 459, 465 (9th Cir.) cert. denied, 375 U.S. 902, 84 S.Ct. 191, 11 L.Ed.2d 143 (1963).
IV.
Lockformer’s motion for summary judgment on the issue of its defense of inequitable conduct requires less extensive scrutiny. Here, the burden on defendant is to prove by clear and convincing evidence (1) that plaintiff “misrepresented or failed to disclose material information to the Patent and Trademark Office [“PTO”] in the prosecution of the patent, and (2) that such misrepresentation was intentional.” Allen Archery, Inc. v. Browning Mfg. Co., 819 F.2d 1087, 1094 (Fed.Cir.1987). Information that is misrepresented or undisclosed is “material where there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent.” 37 C.F.R. § 1.56 (1986). Inventors and others applying for patents are bound by an obligation of “candor and good faith” to disclose such information to the PTO. Id.
Here the alleged misrepresentation and nondisclosure relates to plaintiff’s prior sales activities and to alleged prior art consisting of plaintiff’s own Compuduet and defendant’s Duct Magic systems. Inasmuch as I have found that there are issues of fact relating to whether plaintiff’s sales activities were sufficient to invoke the on-sale bar, I can scarcely find that defendant has proved by clear and convincing evidence that the failure to disclose such activities was material. Further, although the issue is closer, the difference between plaintiff’s and defendant’s claims as to the materiality of the features unique to Auto Plot cannot be resolved on the basis of my unaided review of the materials submitted on this motion. At any rate, I certainly cannot resolve it with sufficient clarity to hold that defendant has proved by clear and convincing evidence that a reasonable *107 patent examiner would have considered Compuduct and Duct Magic important in deciding whether to grant the ’635 patent. Therefore, summary judgment must be denied, and there is no need to reach the issue of willfulness, which defendant also must prove by clear and convincing evidence.
V.
Finally, defendant suggests that the time and effort of the court and the parties may be saved by a separate bench trial on the issue of inequitable conduct. Although, as its name would suggest, the defense of inequitable conduct is an equitable defense and there is authority to the effect that such a defense may be tried separately to the court, Gardco Mfg., Inc. v. Herst Lighting Co., 820 F.2d 1209, 1213 (Fed.Cir.1987), it is not at all clear on this record that that defense is sufficiently distinct from the underlying patentability claims to warrant such a separate trial. Nor is it clear that such a separate trial would in fact conserve the time of a court that would be required not only to hear the matter but also to rationalize any decision with appropriate findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a). The attractiveness of such an alternative can be explored further at a conference among counsel and the court.
******
For the reasons set forth above, defendant’s motions are denied.
SO ORDERED.

. "A person shall be entitled to a patent unless ... (b) the invention was ... on sale in this country, more than one year prior to the date of the application for patent in the United States_"